# Clifton's Heirs *vs* Dougherty's Heirs; and Dougherty's Heirs *vs* Riddle, &c.

CHANCERY.

ERROR TO THE TRIMBLE CIRCUIT.                    *Case* 118.

*Equities.*

JUDGE MARSHALL delivered the opinion of the Court.                    *July* 2.

WE think this decree is according to the equity of the case throughout. The sale of the land was, to some extent, absolutely necessary for the payment of the debts of Clifton, some of which had a lien on the land itself, which was held only by bond. It can scarcely be doubted that there was less sacrifice in the sale actually made, than if there had been a coercive sale, which would have doubtless taken the same land and more; and the fair inference from all the circumstances is, that in saving the negro man, and making all the debts by sale of a portion of the land, the interest of the infant heirs was promoted. This was no case of mere fancied benefit contrived by friends, in order to have an opportunity of putting orphan's money in their own pockets. Every cent of the proceeds was applied to the payment of debts. The administrators who procured the act authorizing the sale to be made by them, gained nothing. One was the mother of the infants, and the other, by the exhibition of his settlement, and by other circumstances, has shown himself to have been their disinterested friend. The manner and terms of the sale itself, though assailed in the pleadings, have not been impeached by proof. The failure to give the

CLIFTON'S H'RS.
vs
DOUGHERTY'S
H'RS. &C.

bond required by the act for securing to the heirs whatever proceeds of the sale might remain after payment of debts, may have subjected the purchasers to the hazard of a proper applicatin of the proceeds; but as a bond was in fact afterwards executed, such as the act prescribes, and as the proceeds were, in fact, all applied to the payment of debts, we think the failure to execute the bond before the sale, cannot have the effect of making it void or voidable. We are satisfied too, that there was a mistake in the bond executed by the Commissioners to the purcheser, in describing where or how the boundary was to be run. We do not doubt, from the face of the bond, and other circumstances apparent in the cause, that six hundred acres were sold—that the sale was by quantity, and there having been no survey, a description was given of such boundary as it was supposed would include the quantity; but that owing to a mistake as to the manner in which the lines of the original survey actually run, the description would only include 300 acres. And as the Commissioner, Butler, in whom the legal title is now vested, admits the mistake, and is willing to correct it, we think it may be, and was properly corrected, by giving to the call for quantity its proper influence, rejecting the repugnant calls, and laying down the quantity so as to conform as nearly as possible with the general description, and to embrace the land actually sold. Clifton's heirs therefore cannot justly complain that the sale was not declared null or rescinded, nor that the Commissioner was directed to convey the quantity of 600 acres.

Of the 600 acres, the Court decreed 300 acres to be conveyed to the heirs of R. S. Dougherty, who had filed the original bill, and 300 to Wm. Riddle, who had come in by cross bill, and the question principally litigated, is whether Riddle was entitled to a conveyance of any part.

It appears that the land was purchased jointly for $1,750 25, by Michael and Hannibal Dougherty, at the Commissioner's sale, in August, 1822, when they received a joint bond for the conveyance, and took possession; Michael, the father, residing on the upper part, and Hannibal, the son, on the lower part of the tract, which

The case stated
as between
Dougherty and
Riddle.

included a mill, and Robert S. Dougherty, another son, resided with the father. In September, 1823, M. and H. Dougherty executed articles of agreement with John Dougherty, another son of Michael, by which they sold and contracted to convey to him the said 600 acres when he should pay, as he undertook to do, certain debts therein specified, amounting to $1,082 13 cents, the greater part of which was to be paid in about two years, and the residue at intermediate periods. In July, 1839, John Dougherty, by indorsement on said articles, purporting to be "for value received," assigned the same to Robert S. Dougherty, who shortly afterwards commenced this suit. It does not appear that the title bond from the Commissioners was delivered to John Dougherty, but the contrary may be assumed, from the fact that it was not assigned. M. and H. Dougherty then retained the possession of the land, and also of the bond, after this contract with John Dougherty. And things so continued until 1830, when M. Dougherty having previously died, leaving R. S. Dougherty in possession of the upper part of the tract, Hannibal Dougherty executed a writing to A. J. Riddle, evidencing a sale of 300 acres, including the mill, with a general description of the boundary, and providing expressly that it should be run so as to throw all the tillable land into R. S. Dougherty's tract. Upon this writing is also a receipt for $500, as the price of the land, and an authority for the conveyance to be made to Riddle, who immediately took possession, and retained it until his death, since which, William Riddle, as his heir, has been in possession, and claims a conveyance, which was decreed him according to the boundaries described in the bond. It appears that R. S. Dougherty knew of this sale and bond and payment, very shortly after it took place, if not at the time, and made no objection, and as he and Hannibal had agreed where the boundary between them should run, when they should get the title, the presumption is, that the description in the bond corresponds with that agreement, and that if Riddle is entitled to a conveyance at all, he is entitled according to the calls of the bond. For about seven years before Riddle's purchase, his vendor, with the evidence

An elder equity may be waived or lost by laches

CLIFTON'S H'RS.
vs
DOUGHERTY'S
H'RS. &C.

in failing to as-
sert it whilst a
junior equity is
acquired with
the knowledge of
the holder of the
elder.

of equitable title in his custody, or in that of his father claiming under the same, was permitted to remain in possession and use and improve the land as his own, and Riddle paying his money on the faith of these evidences of title, remained in undisturbed possession for nine years longer, during which he also expended his labor and money in improving the land, and neither John Dougherty nor R. S. Dougherty, who now sets up an equity to it, ever asserted title or apprized him of any danger. On the contrary, it is proved that R. S. Dougherty had said Riddle's title was good, and that "we," that is, himself and Hannibal had sold him the land, and he had himself offered his portion for sale some time before the assignment by John to him. These are certainly strong equitable circumstances in favor of Riddle's claim, considering it as a prior equity. And although, as between valid equities, the elder must prevail, we think there cannot be a doubt, that the holder of an elder equity may, by his conduct, waive or lose his priority, and that circumstances may convert the junior into the better equity. And the claim set up in this bill by R. S. Dougherty, is subject to be met, not only by equitable circumstances existing against his assignor, John Dougherty, but also by such circumstances existing against himself. At any rate, the circumstances which have been referred to, must have the effect of throwing upon the assertors of the elder claim, the validity of which is, in all respects denied, the *onus* of showing that it is a valid, prior and subsisting equity, good against Hannibal Dougherty at the time of his sale to Riddle, and good against Riddle when assigned to R. S. Dougherty, and such as he might assert against Riddle.

That John Dougherty should have paid for this land and have remained quietly content, without either a return of the money or any enjoyment of the land, for fourteen, or fifteen, or sixteen years, during the greater part of which time one half of the land was in possession of a stranger, claiming it as his own, is not satisfactorily, nor indeed at all accounted for. If his residence in a distant State or Territory shows that he could not enjoy the land, it does not show that he did not want the money. But it tends

to show that he did not want the land at first, and all the facts show that he never has wanted it; and there is nothing to show that his condition was such as to enable him to lay out of the money for such a length of time. Nor is there any evidence that he had it to spare at first, or sufficient proof that he ever did, in fact, pay it. He certainly did not pay in the manner provided for in the contract. This he admits, and both he and Robert alledge payment in a different mode, that is, direct payment in cash. But they do not give the same account of the matter. They produce neither voucher nor writing to prove the payment. During sixteen years, the land is held and used as if no such contract existed. John, during all that time, makes no complaint or claim about land or money; and at the end of that period, assigns the contract to Robert, and as we may assume, for nothing. Surely these facts tend strongly to prove either that the consideration for the land was never paid by John, or that if it was, the transaction was intended really, as a loan secured by the land, and that the loan having been repaid, the receipts may have been given up; and it is a circumstance worthy of note, and relied on by Riddle in his cross bill, that it was not until after the death of Hannibal Dougherty, that this claim of John was asserted against him. Hannibal had removed to Missouri where John resided, and there died insolvent. It may be presumed that Robert S. became possessed of his father's papers on his death, and that John became possessed of such papers as Hannibal may have had. Whatever evidence may have existed among such papers, going to show the real nature of this transaction, or to prove that any money advanced by John had been re-paid, is thus wholly beyond the reach of Riddle; and Hannibal himself, whose statement might have established the truth, being dead, the bond of M. and H. Dougherty to John, which may itself have come to the possession of Robert S. or of John, among the papers of Michael or Hannibal, is assigned to the former, and set up as a valid claim upon the land which Riddle had been permitted to buy and improve.

CLIFTON'S H'RS.
*vs*
DOUGHERTY'S
H'RS. &c.

A *bona fide* purchaser for a valuable consideration, will hold against a prior apparent equity, but not appearing to be on good consideration.

John Dougherty admits in his first answer, a verbal agreement that his father and Hannibal might redeem the land within the year. R. S. Dougherty, in his answer, states the agreement to have been, that if he and Hannibal should re-pay the money, they should have the land. John Dougherty, in his second answer, states the agreement in the same way, and that he would have been willing to execute it with Hannibal, but he had no right to sell to Riddle, and he would not convey to him. There is no evidence that A. J. Riddle knew of the contract of sale to John Dougherty, when he purchased. The fact that he paid his money, and the nature of the transfer which he received, tend to disprove such knowledge; as the conduct of all three of the brothers tends strongly to prove that there was not, at that time, any valid subsisting contract entitling John to the interest of Hannibal. The inferiority in the quality of the land sold to Riddle, accounts for the price. As already intimated, the fair inference from the pleadings and the want of proof, is, that John's assignment of the bond to Robert S. was gratuitous; and this fact coincides with and confirms the conclusion drawn from the whole case, that the bond had no subsisting validity when it was thus assigned. The second answer of John Dougherty contradicts the inference which might be drawn from some of the testimony, that Riddle had applied to him for a deed before this suit was brought, and if it be true that before that time, he had heard of the transfer to him and expected to get a title from him, this does not reach back to the date of the purchase from Hannibal, nor affect the conclusion to which we have come.

Wherefore, the decree, in both of its branches, is affirmed.

*Geo. Armstrong* for Clifton's heirs; *Harlan & Craddock and McHenry* for Dougherty's heirs; *Loughborough* for Riddle.